American Pitch Pine Export Company, Inc. v. Commissioner.
American Pitch Pine Export Co. v. Commissioner
Docket No. 17680.
United States Tax Court
1949 Tax Ct. Memo LEXIS 36; 8 T.C.M. (CCH) 976; T.C.M. (RIA) 49267; November 2, 1949
*36 Robert Ash, Esq., Munsey Bldg., Washington, D.C., and John Y. Merrell, Esq., for the petitioner. F. S. Gettle, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding was brought for a redetermination of deficiencies as follows: Declared Value
Excess-Profits
Excess-Profits
Year
Income Tax
Tax
Tax
October 31, 1941
$5,162.78
$ 836.47
October 31, 1942
5,643.77
$2,147.11
41,221.47
October 31, 1943
49,790.59
The questions involved are (1) whether the amounts allowed by respondent as compensation for personal services actually rendered by petitioner's officer-stockholders, employee-stockholders, and non-employee stockholders are reasonable for each of the fiscal years ended October 31, 1941, 1942, and 1943; (2) whether respondent erred in determining that no part of the provision for bad debts claimed by petitioner for the fiscal year ended October 31, 1942, constituted a reasonable addition to petitioner's reserve for bad debts; and (3) whether respondent erred in increasing petitioner's income for the fiscal year ended October 31, 1943, on his determination that petitioner's *37 inventory as of that date was understated. The case was submitted upon a stipulation and evidence adduced at the hearing. Those facts hereinafter appearing which are not from the stipulation are otherwise found from the record. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, a Louisiana corporation, the successor of American Pitch Pine Export Company, was organized and began business on November 15, 1935. It filed its tax returns for the fiscal years ended October 31, 1941, 1942, and 1943 with the collector of internal revenue for the district of Louisiana. Petitioner's books were kept and its returns filed on an accrual basis. Prior to 1941 petitioner was engaged primarily in the business of exporting lumber. The original authorized capital stock of petitioner was $50,000, with a par value of $100 which was issued for cash. On October 27, 1937, the authorized capital stock was increased to $100,000 of which $41,000 was issued for cash during 1937 and 1938, and $9,000 was issued as a stock dividend in 1939. The stockholders and number of shares owned by each on the dates shown were as follows: Number of Shares Owned
11/15
10/31
10/31
10/31
10/31
10/31
10/31
10/31
10/31
Stockholder
1935
1936
1937
1938
1939
1940
1941
1942
1943
J. E. Burtis
150
120
324
424
473
473
473
667
667
W. J. Sowers
150
T. A. Stubbs
100
95
33
42
46
46
46
66
66
Natalbany Lumber Company
50
50
212
212
Pearl River Valley Lbr. Co
50
100
E. H. Albrecht
10
23
29
32
32
32
50
50
A. Campodonico
10
23
29
32
32
32
50
50
L. N. Hobbs
10
24
31
34
34
34
50
50
C. R. Holloway
5
10
13
14
14
14
20
20
G. R. Todd
10
14
18
A. V. Hunt
9
11
12
W. B. McDavid
28
36
50
50
50
71
71
Denkmann Lumber Company
65
301
301
301
W. H. Tippin
6
6
18
26
26
Total Outstanding
500
500
700
910
1000
988
1000
1000
1000
Treasury Stock
12
Total Issued
1000
*38 During the period of November 15, 1935, to October 31, 1943, petitioner paid its officers and stockholder-employees the following amounts which were designated as compensation for services and are the total compensation paid to the respective individuals: Years Ended
11/16/35
to
Officers
10/31/36
10/31/37
10/31/38
10/31/39
W. J. Sowers, Pres.
$10,350.00
J. E. Burtis, Pres.
5,625.00
$ 8,050.00
$ 8,025.00
$ 7,500.00
T. A. Stubbs, Vice-Pres, & Treas.
3,610.00
5,138.50
5,000.00
5,000.00
L. N. Hobbs, Sec.
1,357.50
3,453.00
3,375.00
3,690.00
Other Stockholders
E. H. Albrecht
3,550.00
4,485.00
4,312.50
4,312.50
A. Campodonico
1,855.00
2,752.50
2,812.50
3,075.00
W. H. Tippin
437.50
2,275.00
2,187.50
2,400.00
C. R. Holloway
945.00
3,445.40
W. B. McDavid
8,015.35
2,500.00
6,158.59
Years Ended
Officers
10/31/40
10/31/41
10/31/42
10/31/43
W.J. Sowers, Pres.
J.E.Burtis, Pres.
$ 9,000.00
$19,000.00
$38,917.95
$32,500.00
T.A. Stubbs, Vice-Pres. & Treas.
5,100.00
7,080.00
14,608.95
16,250.00
L.N. Hobbs, Sec.
3,600.00
5,100.00
11,667.16
13,000.00
Other Stockholders
E.H. Albrecht
4,140.00
5,640.00
11,712.16
13,000.00
A. Campodonico
3,000.00
4,500.00
7,083.60
7,800.00
W.H. Tippin
2,862.50
5,175.00
11,867.16
13,000.00
C.R. Holloway
2,547.81
4,689.12
12,834.20
11,050.00
W.B. McDavid
6,343.15
3,673.89
2,262.67
2,400.00
*39 The total number of employees of petitioner and the total amount of salaries paid these employees during the respective years were as follows: Total
Total Number
Wages and
of
Salaries
Years Ended
Employees
Paid
10/31/39
216
$ 77,894.51
10/31/40
311
74,327.34
10/31/41
323
76,962.71
10/31/42
481
162,317.41
10/31/43
767
447,833.34
The amounts designated as dividends and paid by petitioner during the eight years ended October 31, 1943, were as follows: 10/31/36
None
10/31/37
$30,000.00
10/31/38
31,500.00
10/31/39
18,100.00
10/31/40
None
10/31/41
None
10/31/42
25,000.00
10/31/43
None
In December 1943 petitioner paid a dividend of $25,000. Petitioner's sales for the fiscal years ended October 31, 1936, through 1943, as shown by its records, were as follows: Less: Sales
Ocean Freight
Net Sales
1936
$2,433,171.47
$498,946.50
$1,934,224.97
1937
2,710,765.47
575,486.98
2,135,278.49
1938
2,261,297.31
590,064.74
1,671,232.47
1939
2,608,500.60
629,182.76
1,979,317.84
1940
2,431,129.47
767,830.30
1,663,299.17
1941
2,611,361.23
217,328.31
2,394,032.92
1942
3,236,863.71
159,047.19
3,077,816.52
1943
3,175,174.65
4,556.37
3,170,618.28
*40 The gross profit and net profit of petitioner for the fiscal years ended October 31, 1936, through 1943, as shown by its records, were as follows: Net Profit
Gross Profit
Before Taxes
1936
$126,745.12
$ 37,544.15
1937
106,808.52
21,943.32
1938
130,852.77
38,351.32
1939
126,262.67
24,185.60
1940
110,055.38
16,519.67
1941
150,650.63
29,615.85
1942
320,977.12
118,920.90
1943
314,924.83
65,385.47
In an amended return for 1940, filed January 20, 1942, after the close of the fiscal year 1941, petitioner adjusted its gross profit to $137,960.80 and its net profits before taxes to $43,834.78. The total number of feet of lumber sold by petitioner during the respective years is as follows: Number of Feet
Year ended 10/31/36
47,272.358
Year ended 10/31/37
46,515,209
Year ended 10/31/38
38,145,115
Year ended 10/31/39
42,391,622
Year ended 10/31/40
38,605,226
Year ended 10/31/41
61,521,959
Year ended 10/31/42
67,704,355
Year ended 10/31/43
41,325,533
Of the total net sales of petitioner the following represent shipments from its plant at Slidell, Louisiana: Number of
Feet
Amount
Year ended Oct. 31, 1943
26,118,897
$1,601,271.89
*41 Beginning with the taxable year ended October 31, 1941, substantially all of petitioner's business came from agencies of the United States Government or from persons holding war contracts. The compensation in controversy for the fiscal years ended October 31, 1941, 1942, and 1943, including bonuses as claimed by petitioner and allowed by respondent, was as follows: Oct. 31,
Oct. 31,
Oct. 31,
Year Ended
1941
Year Ended
1942
Year Ended
1943
Claimed
Allowed
Claimed
Allowed
Claimed
Allowed
Burtis, Pres.
$19,000.00
$ 9,750.00
$ 38,917.95
$16,167.95
$ 32,500.00
$22,500.00
Stubbs, V-Pres.
7,080.00
5,525.00
14,608.95
8,083.95
16,250.00
11,250.00
Hobbs, Sec'y.
5,100.00
3,900.00
11,667.16
6,467.16
13,000.00
9,000.00
Albrecht
5,640.00
4,485.00
11,712.16
6,467.16
13,000.00
9,000.00
Campodonico
4,500.00
3,250.00
7,083.60
4,533.60
7,800.00
5,400.00
Tippin
5,175.00
4,800.00
11,867.16
6,467.16
13,000.00
9,000.00
Holloway
600.00
8,421.00
(4,250.00 *
2,550.00
(6,800.00 *
McDavid
2,145.00
1,500.00
2,400.00
Totals
$49,240.00
$31,710.00
$105,777.98
$48,186.98
$109,000.00
$68,700.00
*42 On November 1, 1941, Burtis, on behalf of petitioner, made an offer to purchase 301 shares of petitioner's capital stock from Denkmann Lumber Company at $103.41 per share, which offer was accepted on November 2, 1941. The 301 shares of stock were purchased on November 4, 1941, by the issuance of petitioner's check. The additional shares of stock were issued to the respective shareholders in proportion to the bonus accrued as of October 31, 1941, and the bonus was applied to the purchase of the shares. The shares reissued and bonuses accrued are as shown in the following schedule: Shares
Shares
Bonus
Name of
Owned
Owned
Accrued
Stockholder
10/31/41
11/4/41
10/31/41
J. E. Burtis
473
667
$10,000.00
T. A. Stubbs
46
66
1,980.00
L. N. Hobbs
34
50
1,500.00
E. H. Albrecht
32
50
1,500.00
A. Campodonico
32
50
1,500.00
W. H. Tippin
18
26
775.00
C. R. Holloway
14
20
600.00
W. B. McDavid
50
71
2,145.00
Total
699
1000
$20,000.00
A further bonus of $10,000 to Burtis was authorized December 29, 1941. On the basis of those bonuses authorized in June and December, 1941, *43 the bonuses amounted per share to the various stockholders as follows: Burtis
$42.28
Stubbs
43.04
Hobbs
44.12
Albrecht
46.88
Campodonico
46.88
Tippin
43.05
Holloway
42.86
McDavid
42.90
Denkmann Lumber Company, which, as above indicated, was a shareholder until the time of the sale of its interest, received no "bonus" payment as such. During the fiscal year ended October 31, 1942, petitioner paid additional "compensation and/or bonus" to employees as follows: December
April 21,
June,
Bonus
Compensation
1941
1942
1942
June 1942
and Bonuses
($ 750.00
Burtis
(10,000.00
$ 3,750.00
$ 750.00
$ 3,167.95
$18,417.95
Stubbs
425.00
1,875.00
375.00
1,583.95
4,258.95
Hobbs
400.00
1,500.00
300.00
1,267.16
3,467.16
Albrecht
345.00
( 10.00
300.00
1,267.16
3,422.16
(1,500.00
Campodonico
250.00
750.00
150.00
633.60
1,783.60
Tippin
400.00
1,500.00
300.00
1,267.16
3,467.16
Holloway
440.00
1,575.00
250.00
1,056.00
3,321.00
McDavid
1,500.00
1,500.00
$13,010.00
$13,960.00
$2,425.00
$10,242.98
$39,637.98
During the fiscal year ended October 31, 1943, bonuses were paid *44 as follows: Burtis
$2,500.00
Stubbs
1,250.00
Hobbs
1,000.00
Albrecht
1,000.00
Campodonico
600.00
Tippin
1,000.00
Holloway
850.00
McDavid
$8,200.00
Prior to the war petitioner had built up a successful lumber export business. Such a business is primarily a personal service operation in which experience and knowledge of foreign markets, of the grades and types of lumber sold in foreign commerce, foreign exchange, financial standing of foreign customers, sources of lumber in the United States, domestic transportation, insurance and ocean transportation, are desirable. In addition, a successful exporter should have a good line of credit and the ability to adjust complaints fairly with his foreign customers. Prior to the war petitioner shipped lumber to 400 or 500 customers in 40 different countries and had approximately 50 agents abroad. Its best markets were Argentina, England, France, Spain, and South Africa. The outbreak of the European war in 1939 ended petitioner's European business and reduced its other export business. When this country entered the war in 1941 petitioner's export trade was regarded as lost. Petitioner, rather than "sitting *45 out of the war" sought to adjust its operations to a domestic lumber business. Other large export lumber companies decided that such a transition was not possible. Petitioner closed its branch office in Savannah, Georgia, and transferred the manager, W. H. Tippin, to Washington, D.C., where he opened a branch office. Most of petitioner's business during the taxable years 1941, 1942, and 1943, was obtained at Government auctions. The Government would invite lumber dealers to attend and submit bids on schedules of lumber needed for various projects. There was no advance notice as to the type of lumber to be purchased, and the bids were made on the spot at the auction. The successful bidder obtained a memorandum contract requiring him to ship lumber to various contractors building particular projects for the Government. The Government assumed no responsibility for the payment which was to be made by the private contractor. Petitioner's representatives at the auction had full authority in making the bids, and petitioner never repudiated bids received in this way. Another lumber company which had been in the export market after attending three or four of these auctions decided it was *46 not able to compete for this type business. At this time the real problem was obtaining lumber to sell. Although petitioner had priorities for the purchase of lumber, most other lumber dealers also had priorities, and the priority amounted to little more than a license to purchase the lumber if it could be found. Petitioner had to communicate with all lumber producers and obtain it wherever it could be found. The domestic specifications were different from those for export, and the domestic mills were located inland. Those mills which had produced for export were near the Tidewater. O.P.A. regulations required that lumber be sold at a ceiling price, and for petitioner to make a profit it had to purchase at less than ceiling or gain an advantage financially by obtaining a lumber of such quality that more could be shipped at the established freight rate so that petitioner's profit came from that differential. During 1941, 1942, and 1943, petitioner had difficulty in obtaining competent employees. Prior to 1941 petitioner's employees worked 5 1/2 days a week. During the taxable years a night shift was instituted and the employees worked on Saturdays and Sundays. Frequently officers *47 and key employees worked seven days a week and at night during the week. In the latter part of 1942 the Government desired a large supply of timbers in the Gulf area. Burtis and Tippin negotiated with the War Department and petitioner was authorized to acquire 20,000,000 feet of Douglas Fir and Southern Yellow Pine timbers in the rough. Petitioner was to charge the ceiling prices and O.P.A. established milling charges, plus transportation. If the Government found it necessary to terminate the agreement upon notification it would purchase and assume title to unused materials covered by the contract to a maximum value of $300,000 (later raised to $400,000). Another lumber company had been offered this contract but had refused to undertake it because of the risk and trouble involved. Petitioner constructed a $125,000 plant at Slidell after searching the South for materials and equipment. It placed a key employee, A. Campodonico, in charge. Petitioner made the purchases of the required lumber without Government assistance. Petitioner operated the mill at Slidell and sent the lumber manufactured to private contractors operating under Government contracts. Petitioner obtained a bank *48 loan on an open note in the amount of $900,000 dated April 2, 1943, signed by Burtis and Stubbs. No security was given. The money was needed to finance the construction and operation of the Slidell plant. In the fiscal year ended October 31, 1943, the net sales of lumber from the Slidell plant were 55 per cent of the total of petitioner's net sales for that year; the Slidell plant accounted for 63 per cent of the total feet of lumber sold by petitioner during that year. The Government paid petitioner a fixed fee per 1,000 feet for the remanufacture of lumber at the Slidell plant, which fee resulted in a favorable mark-up and a larger gross profit from the Slidell plant than all other sales made by petitioner. In September, 1943, the Government terminated the Slidell contract. Petitioner agreed to the termination and made no claim against the Government. The plant had operated approximately one year. In the export and domestic business conducted by petitioner the personal efforts and abilities of its employees were important income-producing factors. Petitioner's president, John E. Burtis, was 42 years old in 1942. He had entered the lumber export business in 1916, and except *49 for brief periods when he was in school or in the Army he was continuously engaged in the lumber export business. He went to work for petitioner's predecessor as a clerk in 1919. He was soon promoted to assistant transportation manager and worked with W. A. Powell, a man of outstanding ability in the transportation of export lumber. Upon Powell's death, Burtis became transportation manager of petitioner's predecessor at a salary $300of per month. The former transportation manager had received $10,000 a year as salary. Petitioner's first president, W. J. Sowers, died in May, 1936, and Burtis thereupon became president and has held that office to the present time. Burtis objected to Sowers drawing $18,000 a year as salary in 1935, in the belief that the company should pay smaller salaries and build up its business. Since 1936 Burtis has made all of the major policies and administrative decisions for petitioner, and the other officers and employees were under his supervision. Burtis engineered the transition from export to domestic business. He devoted his full efforts to petitioner during the taxable years. The Slidell plant was under his supervision and required much of his time *50 during its operation. T. A. Stubbs was petitioner's vice-president during the taxable years. He had been engaged since 1896 in the lumber and lumber shipping business, and for 10 years was comptroller of a large lumber shipping concern. He had had long experience in foreign exchange transactions and was well respected in financial circles. Stubbs joined petitioner's predecessor in 1922, and prior to 1941 he had charge of all accounting, supervised foreign exchange, the credit department, and all of petitioner's financial matters. He assisted in arranging for credit and loans in order for petitioner to finance domestic business. His hours of work per week increased from 40 or 50 to about 65 hours. He worked at home at night and on Sundays. He supervised the new and inexperienced help, with the help of an assistant; he kept all of petitioner's books, including a general ledger, customers' ledger, sales journal, and cash book; he established a separate set of books for the Slidell operation. During the taxable years Stubbs devoted his full time to petitioner's business. L. N. Hobbs was petitioner's secretary during the taxable years. He had entered the lumber business in 1909. He *51 worked for the Emergency Fleet Corporation in 1917 and until he entered the Army in 1918. He worked with petitioner's predecessor in 1923 in its sales department and handled sales to Argentina, Uruguay, Europe, and Africa. He commenced work with petitioner in May, 1936, and has continuously devoted his full time to this employment. In the taxable years Hobbs devoted most of his time to Government orders and buying and selling lumber. His duties and work increased during these years; he traveled and represented petitioner at the Government auctions where he had the responsibility of determining the amount of bids. From 1941, through 1943, E. H. Albrecht was general manager of petitioner's office. He has since become vice-president. He first entered the lumber business in Germany in 1901. Albrecht came to this country in 1909, became a naturalized citizen in 1922. He has at all times worked in the lumber and lumber export business and went with petitioner's predecessor in 1927 as manager of its hard wood department and was in charge of all sales of hard wood for export. He is experienced in foreign loans. In 1929 and 1934 he made extended trips to Europe and North Africa to study markets, *52 meet customers, check on accounts, and investigate credit standing. Albrecht spoke two languages and understood four. During the taxable years Albrecht supervised the application of Government regulations, countersigned all checks and supervised the execution of contracts. He also attended some of the Government auctions and represented petitioner in bidding on contracts. Albrecht devoted his full time to petitioner. There was an increase in his duties and responsibilities during the taxable years. He worked on an average of from 10 to 12 hours a day during the week and sometimes on Sundays. He had 40 people under his supervision. Prior to the taxable years he worked only about half as many hours as he did during the taxable years. The increase was made necessary by the great volume of business. C. R. Holloway, petitioner's transportation manager at the time of the hearing was 53 years old and has been engaged in transportation work since 1916. From 1923 to 1935, he was associated with companies who handled the freight brokerage business of petitioner's predecessors. He became an employee of petitioner in 1935 but left in 1936 to operate a freight brokerage business on his own *53 account. He, at that time, handled petitioner's account as a broker on the same basis as business was handled for other firms. In 1942 he was put on a flat guarantee basis for petitioner's business, and instead of a commission he received a flat fee of $1,100 per month for handling all of petitioner's shipments. On July 1, 1943, Holloway closed his brokerage business and became employed by petitioner as transportation manager. He then had about 20 men under his supervision, including a night shift. He devoted more time to petitioner's business after July 1, 1943, than he had devoted to his own business prior to that time. War transportation conditions made the work difficult. A. Campodonico was employed by petitioner during the taxable years. He died in September, 1948. He had been engaged in the lumber export business during his entire adult life. He had been associated with petitioner's predecessor and went with petitioner in 1935. Prior to 1941 he was in charge of sales to all of the West Indies and Latin American countries, except Argentina and Uruguay. In 1941 and 1942, he devoted his time to the purchase of lumber and in the latter part of 1942 became manager of the Slidell *54 office. During the taxable years he devoted his full time to petitioner. Earl Williams was production manager at the Slidell plant in 1941, and received a salary of $12,000 a year. W. H. Tippin was employed by petitioner during the taxable years. He died in 1943 at the age of 55. Tippin began work for petitioner in 1936, and served as manager of the Tampa, Jacksonville, and Savannah offices. In 1941, when petitioner closed its Savannah office and sent Tippin to Washington to open an office, he acted as petitioner's key representative with the various Governmental agencies. He also attended the lumber auctions that were held in Washington. In May, 1942, Tippin was receiving approximately $700 a month from petitioner and had an offer from a competing lumber company at a salary of $12,000 per year. Petitioner met the offer and increased Tippin's salary at that time. Petitioner also increased the salary of other key employees. W. B. McDavid became petitioner's exclusive agent in Argentina in 1935. He handled no other accounts. He had started with the predecessor corporation in 1919 as a sales representative with a guarantee of approximately $25,000 per year. He has lived in Argentina *55 for about 40 years. In the taxable years the Argentine market was closed and the payments made to McDavid were a fee to retain his services. Petitioner was desirous of retaining the large Argentine market and McDavid's services. McDavid was well qualified to serve as petitioner's agent. Petitioner was not doing any Argentine business at the time of the hearing but had expectations of doing some in the future. Petitioner also made payments to an inactive agent in Cuba in order to retain his services after the war. The Dantzler Lumber & Export Company, Tampa, Florida, was a corporation primarily engaged in the export of lumber to the West Indies, South America, and Europe. It began business in 1926 and has continued in that type of business up to the present time, except as affected by wartime restrictions on exports to Europe. L. W. Dantzler, its president, had been with the corporation since 1926. From 1935 to February 1943 he was vice-president and treasurer and succeeded his father as president upon the death of his father in February, 1943. He was a full-time employee of the corporation. W. F. Walker, a full-time employee of Dantzler Lumber & Export Company, has been secretary *56 and in charge of the buying and selling department until he was elected vice-president in February 1943. The Dantzler Lumber & Export Company continued business during the war under war restrictions. The purchase and shipping of lumber became more difficult. In 1939 and 1940 business in Europe and Argentina fell off. The demand for lumber for defense bases became tremendous. The Dantzler Lumber & Export Company was able to get lumber to fill its orders during the years 1941 to 1943. During the years 1936 to 1943, inclusive, the Dantzler Lumber & Export Company shipped lumber shown as follows: Years
Feet
1936
47,867.955
1937
41,516.347
1938
43,740,414
1939
41,541,939
1940
25,054,166
1941
42,580,509
1942
51,162,915
1943
26,700,100
Net sales, gross profit and net income, as shown by the books of Dantzler Lumber & Export Company, for the years 1936 to 1943, are as follows: Year
Net Sales
Gross Profit
Net Income
Calendar Year
1936
$1,585,693.92
$181,747.32
$38,205.05
1937
1,691,155.01
210,298.75
54,856.61
1938
1,584,093.25
217,868.82
46,500.92
1939
1,573,773.95
209,506.80
47,893.88
Ending 8/31/40
(8 mos.)
846,160.19
105,115.43
(2,268.64)
8/31/41
1,740,960.08
222,926.12
52,152.58
8/31/42
2,642,889.65
299,323.01
84,597.58
8/31/43
1,591,381.25
204,620.66
66,034.16
*57 The yearly salary, bonus paid, shares of capital stock held and dividends paid to the officers of Dantzler Lumber & Export Company for the years 1938 to 1943, inclusive, are shown as follows: Shares of
Capital
Yearly
Stock
Dividends
Years Officer
Salary
Bonus
Total
Held
Received
1938 L. N. Dantzler, Sr., Pres.
$ 6,000.00
$ 500.00
$ 6,500.00
375
$ 8,250.00
L. N. Dantzler, Jr., Vice-Pres.
&
Treas.
6,000.00
500.00
6,500.00
375
8,250.00
W. F. Walker, Secty.
6,000.00
500.00
6,500.00
250
5,500.00
$18,000.00
$1,500.00
$19,500.00
1000
$22,000.00
1939 L. N. Dantzler, Sr., Pres.
$ 6,000.00
$ 360.00
$ 6,360.00
375
7,500.00
L. N. Dantzler, Jr., Vice-Pres.
&
Treas.
6,000.00
360.00
6,360.00
375
7,500.00
W. F. Walker, Secty.
6,000.00
360.00
6,360.00
250
5,000.00
$18,000.00
$1,080.00
$19,080.00
1000
$20,000.00
1940 L. N. Dantzler, Sr., Pres.
$ 4,000.00
$ 4,000.00
375
None
8 mos. L. N. Dantzler, Jr., Vice-Pres.
&
Treas.
4,000.00
4,000.00
375
None
W. F. Walker, Secty.
4,000.00
4,000.00
250
None
$12,000.00
$12,000.00
1000
None
1941 L. N. Dantzler, Sr., Pres.
$ 8,400.00
$1,005.00
$ 9,405.00
375
None
L. N. Dantzler, Jr., Vice-Pres.
&
Treas.
8,400.00
1,005.00
9,405.00
375
None
W. F. Walker, Secty.
8,400.00
1,005.00
9,405.00
250
None
$25,200.00
$3,015.00
$28,215.00
1000
None
1942 L. N. Dantzler, Sr., Pres.
$ 8,750.00
$1,312.50
$10,062.50
375
None
L. N. Dantzler, Jr., Vice-Pres.
&
Treas.
8,750.00
1,312.50
10,062.50
375
None
W. F. Walker, Secty.
8,750.00
1,312.50
10,062.50
250
None
$26,250.00
$3,937.50
$30,187.50
1000
None
1943 L. N. Dantzler, Sr., Pres.
$ 4,500.00
$ 4,500.00
300
$ 6,000.00
L. N. Dantzler, Jr., Vice-Pres.
&
Treas. (Pres.)
9,000.00
$1,350.00
10,350.00
405
8,100.00
W. F. Walker, Secty.
7,050.00
1,057.50
8,107.50
250
5,000.00
J. D. Weekley, Secty.
1,500.00
225.00
1,725.00
A. D. West, Treas.
1,200.00
180.00
1,380.00
$23,250.00
$2,812.50
26,062.50
955
$19,100.00
*58 The Standard Export Lumber Company, Ltd., New Orleans, Louisiana, a corporation engaged in the export of lumber and timber, has been in existence since 1906. The officers of Standard Export Lumber Company, Ltd., were full-time employees during the years 1938 to 1943, inclusive. The net shipments of lumber, net sales, gross profit and net profit (or loss) of Standard Export Lumber Company, Ltd., are shown as follows: F/Y ended
Net Profit
Sept. 30
Net Shipments
Net Sales
Gross Profit
(or Loss)
1938
43,390,607 Ft.
$2,427,234.00
$217,006.00
$25,058.00
1939
43,143,179 Ft.
2,479,621.00
213,385.00
18,552.00
1940
21,793,399 Ft.
1,217,819.00
138,464.00
(8,357.00)
1941
16,123,649 Ft.
853,192.00
100,521.00
(2,868.00)
1942
14,443,940 Ft.
852,743.00
155,867.00
16,034.00
1943
9,230,287 Ft.
649,632.00
134,225.00
15,416.00
The officers, yearly salary and bonus paid by the Standard Export Lumber Company, Ltd., for the years 1938 to 1943, inclusive, are shown as follows: Fiscal Year
Ended Sept. 30
Salary
Bonus
Total
1938
E. R. Dumont, President
$15,000.00
$5,000.00
$20,000.00
Wilmer Hayward, Vice-Pres.
10,000.00
3,500.00
13,500.00
F. M. Dickman, Sec. & Treas.
4,800.00
750.00
5,550.00
1939
E. R. Dumont, President
15,000.00
5,000.00
20,000.00
Wilmer Hayward, Vice-Pres.
10,000.00
3,500.00
13,500.00
F. M. Dickman, Sec. & Treas.
4,800.00
1,000.00
5,800.00
1940
E. R. Dumont, President
15,000.00
15,000.00
Wilmer Hayward, Vice-Pres.
10,000.00
10,000.00
F. M. Dickman, Sec. & Treas.
4,800.00
4,800.00
1941
E. R. Dumont, President
15,000.00
15,000.00
Wilmer Hayward, Vice-Pres.
10,000.00
10,000.00
F. M. Dickman, Sec. & Treas.
4,800.00
4,800.00
1942
E. R. Dumont, President
15,000.00
4,250.00
19,250.00
Wilmer Hayward, Vice-Pres.
10,000.00
3,083.00
13,083.00
F. M. Dickman, Sec. & Treas.
6,000.00
900.00
6,900.00
1943
E. R. Dumont, President
15,000.00
3,410.00
18,410.00
Wilmer Hayward, Vice-Pres.
10,000.00
2,660.00
12,660.00
F. M. Dickman, Sec. & Treas.
6,000.00
1,300.00
7,300.00
*59 Reasonable salaries for the years ended October 31, 1941, 1942, and 1943 for the respective employees of petitioner are as follows: 1941
1942
1943
Burtis
$15,000
$22,500
$25,000
Stubbs
7,080
11,250
12,500
Hobbs
5,100
9,000
10,000
Albrecht
5,640
9,000
10,000
Campodonico
4,500
6,000
7,000
Tippin
5,175
9,000
10,000
Holloway
4,250
McDavid
1,500
1,500
1,500
Totals
$43,995
$68,250
$80,250
Inventory Issue As of the close of its fiscal year October 31, 1943, petitioner's sawmill at Slidell had on hand a quantity of resawed lumber, being the waste pieces acquired in cutting large timber to specific sizes. As of this date there were 20 piles of these waste pieces in random widths from 1 X 4 to 2 X 20 and random lengths of from 8 to 50 feet. The various widths and lengths were not separated as to size in the piles. This was in accord with common practice in the lumber business. In making its inventory for October 31, 1943, petitioner had its most experienced lumber inspectors estimate the footage in the 20 piles constituting the waste pieces in question. Burtis and Albrecht examined the inventory sheets, and Burtis examined *60 the piles of lumber. Petitioner adopted the estimated inventory of 830,000 board feet, consisting of 567,107 board feet of fir and 262,893 board feet of pine. This inventory was used for purposes of annual reports, the determination of cost of goods sold and insurance, as well as for Federal tax purposes. The cost of the inventory based on petitioner's estimate and using the prices shown in the notice of deficiency is $59,826.01. After the close of petitioner's fiscal year ended October 31, 1943, and prior to the due date of its 1943 Federal income tax return invoices were made up and the lumber of the 20 piles was sold to Government agencies. The sales were in the period December 11, 1943, to January 12, 1944, and the inventories disclosed a total of 896,723 board feet, being 572,273 board feet of fir, and 324,450 board feet of pine. These invoices were checked by petitioner's president. The cost of the inventory on the basis of board feet shown by actual sales and using the prices set forth in the notice of deficiency as agreed to by the parties is $64,641.14. As of October 31, 1943, it was not feasible to take a physical inventory of the 20 piles of lumber and the estimate was *61 in accord with trade practice. It was an accurate estimate. A good estimate of the footage would be within 10 to 15 per cent of the actual footage. In his notice of deficiency respondent "* * * determined that your inventory as of October 31, 1943, amounted to $269,357.33. Accordingly, it is held that the cost of shipments deducted on your return, based upon an inventory as of October 31, 1943, of $253,854.46, is overstated by the amount of $15,502.87." Bad Debt Reserve Issue Petitioner has always been on the reserve basis for charging off bad debts. For its fiscal year ended October 31, 1942, it added 1/4 of 1 per cent of net shipments to its reserve for bad debts. For the years ended October 31, 1939, 1940, 1941, and 1942, it added 1875 per cent of net shipments. Petitioner's accounts receivable, charges to reserve for bad debts, recoveries, additions to reserve, reserve, and reserve after adjustments by respondent, were as follows: Reserve
as Amended
Charged
Additions
After Adjust-
Balance
to
to
ments By
Year
Receivables
Reserve
Recoveries
Reserve
Reserve
Respondent
10-31-36
$217,721.38
$ 447.00
0
$9,671.12
$ 9,224.12
$ 9,671.12
10-31-37
249,719.89
3,223.44
0
5,338.19
11,338.87
10,004.33
10-31-38
260,034.31
1,030.68
$2,500.31
4,178.08
16,986.58
15,652.04
10-31-39
369,933.60
83.72
1,285.71
3,703.83
21,892.40
20,557.86
10-31-40
170,587.01
11,026.14
0
3,118.69
13,984.95
12,650.41
10-31-41
436,124.42
4,918.80
1,358.92
4,488.81
13,869.36
13,579.34
10-31-42
190,414.96
6,157.12
650.00
5,770.91
14,133.15
8,072.22
10-31-43
281,085.40
874.23
975.87
0
14,234.77
8,173.84
*62 The reserve for bad debts was provided to cover all debts. On October 31, 1942, petitioner had among its accounts receivable the following accounts which did not represent charges for sales: A.B. & C.R.R.
$ 129.01
J. G. Smith
300.00
McWilliams Dredging Co.
7,105.58
Alfredo Gomez
76,57
W. B. McDavid
1,748.98
Graves Lumber Company
1,466.71
Gatlin Lumber Company
7,845.16
(Secured by notes of Gatlin Lumber
Co. with face value of $14,000.00
payable $5.00 per M feet as lum-
ber is delivered)
Waggoner Lumber Co., Foxworth,
Miss.
17,975.00
(Secured by note of Waggoner Lbr.
Co. for $20,000.00 and $35,000.00
of par value capital stock of Wag-
goner Lbr. Co., Inc.)
ADD: Accrued Interest
460.37
TOTAL
$37,107.38
The accounts receivable of petitioner as of October 31, 1942, were as follows: Customers
$145,152.70
Creditors' Debit Balances
37,52
Refunds, Federal and State Income
Taxes
498.08
Freight Advances
7,619.28
Miscellaneous Accounts
9,360.14
Advances to Creditors on Future
Shipments
27,747.24
$190,414.96
The charges and credits to the reserve for bad debts for the year ended October 31, 1942, as shown by petitioner's *63 books were as follows: Credit
1941
Debit
Credit
Balance
11-1 BALANCE
$13,869.36
1942 Bad Accounts Charged Off
4-30 Jones McDaniel
$ 174.60
4-30 Keller
1.00
4-30 Williams Lumber Company
1.00
8-12 Carl Friese & Co. Recovery
$250.00
8-12 Carl Friese & Co. Recovery
200.00
8-31 Baltimore Lumber Company
199.34
10-24 Carl Friese & Co. Recovery
200.00
10-31 Stewart
1.00
10-31 H. Attencio
5,741.19
10-31 Culpepper Lumber Company
23.99
10-31 Kimbraugh & Dickson
15.00
10-31 Provision for year ended 10-31-42
-. 1875 of $3,077.816.25
5,770.91
14,133.15
The bad debts charged off in the fiscal year ended October 31, 1942, and subsequently recovered are as follows: 1942 H. Attencio
$ 508.44
1943 H. Attencio
2,000.00
1944 H. Attencio
1,351.15
Total recovered
$3,859.59
The Audit report prepared by petitioner's accountants contained the following information: "Year Ended October 31, 1941 "ACCOUNTS RECEIVABLE $436,124.42 "On folio 14 of this report we submit a detail list of customers' accounts in the above amount. We show on this list that accounts paid through January 15, 1942, aggregate *64 $389,780.11. Accounts unpaid at January 15, 1942, in the amount of $46,344.31, are considered good and collectible by the Management. "Year Ended October 31, 1942 "ACCOUNTS RECEIVABLE $145,152.70 "On folio 14 of this report we submit a detail list of customers' accounts in the above amount. We show on this list that accounts paid through December 4, 1942, aggregate $93,494.30. Accounts unpaid at December 4, 1942, in the amount of $51,658.40, are considered good and collectible by the Management. "Year Ended October 31, 1943 "ACCOUNTS RECEIVABLE $276,451.73 "On folio 15 of this report we submit a detail list of customers' accounts in the above amount. We show on this list accounts paid through December 1, 1943, aggregate $185,941.11. Accounts unpaid at December 1, 1943, in the amount of $90,502.62, are considered good and collectible. We did not set up any additional Reserve for Doubtful Accounts at October 31, 1943. The Reserve of $14,234.77 now on the books is, in our opinion, considering the condition of the accounts, sufficient to take care of any possible losses that may occur." Most of petitioner's sales during the taxable years were made directly to private contractors *65 who were working on Government contracts. The sale were made at petitioner's risk; the Government did not guarantee payment. In selling at Government auctions petitioner had no information regarding the ultimate contractor or its financial responsibility. At times they had a questionable account. In his notice of deficiency respondent disallowed all of the $5,770.91 deducted by petitioner on its return for the year ended October 31, 1942. The addition to the reserve for bad debts claimed by petitioner for the year ended October 31, 1942, was a reasonable addition to the reserve. Opinion Our ultimate finding on the subject disposes of the issue of reasonable salaries. In reaching our conclusion, we have resorted to all the aids offered by the record. The improved business and profits of the company and any increase in the time and energy required of the employees have been taken into account in allowing increases of upwards of 100 per cent between the years 1940 and 1942. Considering a comparison either with other employers or with other periods of petitioner's business, the record does not persuade us that the salaries claimed were reasonable. We are unable to determine that *66 greater amounts than those we have found were ordinary and necessary expenses. In this determination we are not aided by the existence of truly arms-length dealings in the light of the exclusive stock ownership of petitioner by the officers and employees involved. Golfro Realty Corp., 26 B.T.A. 426-428; L. Schepp Co., 25 B.T.A. 419, 429; Commercial Iron Works v. Commissioner (C.C.A., 5th Cir.), 166 Fed. (2d) 221. We have allowed for each of the years the smallest amount claimed as a reasonable salary to petitioner's agent in the Argentine. The business necessity of retaining his good will against the day when export business would be resumed seems to us to warrant the expenditure of comparatively small amounts as necessary and ordinary. Payment of guaranteed monthly fees to petitioner's shipping broker, however, does not fall into this category. Except for a part of 1943, when he was in the full-time employment of petitioner, and for which we have allowed the amount claimed, there is no satisfactory evidence that his compensation from conventional brokerage fees would not have been adequate. He was not an employee of petitioner before this, *67 and the justification for paying him a fixed compensation has not been shown. Upon consideration of the entire record and without necessarily having detailed here all of the considerations to which attention has been given, we have accordingly concluded that the salaries set forth in our findings are reasonable and should be allowed as deductions. The issue as to the understatement of inventory results from petitioner's use of expert estimates of board feet rather than an actual count in ascertaining the amount of lumber contained at the close of the year in the waste at the Slidell mill. While this may have been in accordance with recognized trade practice, immediately subsequent events established the estimates as being unequivocally erroneous. With the correct facts at hand prior to the filing of its return for that year, petitioner could have clearly reflected its income through their use. Petitioner's brief points to "a real danger that petitioner in estimating its inventory might have arrived at an inventory in excess of the number of feet contained in the 20 piles * * *." Had this happened, a corrected inventory could have been used in filing petitioner's return which respondent *68 would have been bound to accept. Summit Wholesale Grocery Co., 1 B.T.A. 1040; California Canneries Co., 2 B.T.A. 109; Leighton Supply Co., 7 B.T.A. 99. This result is founded upon the premise that, to employ the language of Summit Wholesale Grocery Co., supra, the earlier inventory "did not accurately reflect" the true inventory condition. That criticism is equally applicable to the estimated inventory of petitioner's lumber in the present proceeding. In order for petitioner's closing inventory to give an accurate reflection of its true situation at the close of the year, the revised figures should have been used in accordance with the authorities cited. On this point the deficiency must be sustained. We can find nothing unreasonable in the addition made by petitioner for the year 1942 to its bad debt reserve. The amount deducted was not only in accordance with its established formula, but was less than the charges to the reserve for the same year, and left the reserve at an amount approximately commensurate with its size for a number of prior years even after all adjustments by respondent. When to this is added the fact that *69 petitioner had undertaken to do business with a number of unfamiliar customers, its conduct as prudent business practice seems impeccable, notwithstanding that subsequent events may have shown the accounts to be generally collectible. We think the deduction should have been permitted. Decision will be entered under Rule 50. Footnotes
*. After July 1, 1943. [*] Before July 1, 1943.↩